## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CYNTHIA ANN BURDETT**                                      **CIVIL ACTION**

**VERSUS**                                                              **NO. 06-6138**

**UNUM LIFE INSURANCE COMPANY OF AMERICA, ET AL.**         **SECTION "K"(2)**

### ORDER AND REASONS

Before the Court are motions for summary judgment by Plaintiff Cynthia Ann Burdett ("Plaintiff") and by Defendant Unum Life Insurance Company of America ("Defendant" or "Unum"). The parties agreed that this case should be decided by cross-motions for summary judgment. Having reviewed the relevant law, the pleadings, and the record supplied by the parties, this Court finds summary judgment to be appropriately granted in favor of Plaintiff.

## I.  FACTUAL BACKGROUND

Plaintiff's employer, Tenet Healthcare Corporation, sponsored the Unum policy in question that falls within the definition of an Employee Welfare Benefit Plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Defendant's Motion for Summary Judgment at 1 ("Def. Mot.") (Rec. Doc. 21). ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008) (citing 29 U.S.C. § 1001 *et seq.*, 29 U.S.C. § 1132(a)(1)(B)). The facts of Plaintiff's challenge to Unum's denial of her disability benefits are as follows.

1

Plaintiff originally was employed as a cytotechnologist, a job in which her duties included preparing specimens from various body sites, diagnosing cancer using a microscope and assisting pathologists and radiologists in fine needle aspirations.  Def. Mot. at 2.  In 1992, she had a serious bicycle accident and soon thereafter developed chronic lower back pain.  Plaintiff's Motion for Summary Judgment at 1 ("Pl. Mot.") (Rec. Doc. 15).  After six years of increasing pain, four cages were surgically implanted into her lower spine in 1998.  After surgery one of the cages slipped into a position where it rested on a nerve, causing the Plaintiff nerve damage and pain.  In 2000, her doctors surgically removed the cage and replaced it with a plate and pedicle screws.  She developed complications from this surgery including headaches, a spinal leak, and diabetes insipidus.  Plaintiff continued to work after surgery with some restrictions.

In 2003, Dr. Steck, a neurosurgeon, confirmed that there were no additional procedures to correct Plaintiff's nerve damage and spinal injury.  She had been prescribed pain killers, epidural injections, and physical therapy.  She was referred to Dr. Caroline Barton, a neurologist, for pain management.  Dr. Barton prescribed the Plaintiff narcotic pain medication.

In September 2003, Plaintiff's treating physicians and her employer advised her to stop working.  Plaintiff departed her job on September 26, 2003.  On or about November 25, 2003, Plaintiff submitted a short-term disability claim in which she stated that her treating physician, Dr. Barton advised her to stop working due to "failed back surgery syndrome, low back pain, [and] lumbar radiculopathy."  Def. Mot. at 2.  Unum began paying Plaintiff short-term disability benefits.  On April 22, 2004, Unum granted Plaintiff long-term disability benefits.  In an Employee Supplemental Statement, Plaintiff indicated that she was unable to perform the duties

of her occupation because she experienced severe back pain and spasms when she stood or sat

for any length of time to screen slides under a microscope.  Def. Mot. at 2 (UPCL00022).

    In late 2003, Plaintiff developed a spinal leak and had more surgeries to attempt to fix the

leak, although none where apparently successful.  She moved in with her mother, and was

bedridden for 4 months in 2004.  Pl. Mot. at 2 (UPCL000230).  During 2003 and 2004, she

repeatedly visited the hospital for pain management and surgeries to correct her spine, as well as

epidurals and traction to assist with the pain.  Pl. Mot at 2 (UPCL00209).

    On March 1, 2004, the Social Security Administration awarded Plaintiff disability

benefits, finding that she could not perform any occupation.  On March 15, 2004, Plaintiff

submitted to Defendant a list of treating physicians as well as an estimated functional abilities

("EFA") form completed by her physical therapist, Bruno Steiner, that evaluated Plaintiff's

"measured capacity."  Def. Mot. at 2 (UPCL00016-19).  He concluded that she had "zero

functional capacity."  Def. Mot. at 2 (UPCL0018-19).  Dr. Barton also provided a supplemental

statement dated March 16, 2004, in which she referred to Steiner's EFA form and determined

that Plaintiff was "severely deconditioned."  Def. Mot. at 3 (UPCL00021).  Dr. Barton also

issued restrictions and limitations of "no lifting/no gripping - only occasional stair

climb[ing]/reaching overhead."  Def. Mot at 10 (UPCL00021).

    On April 21, 2004, Unum conducted a telephone interview with Plaintiff.  Def. Mot. at 3

(UPCL01312-16).  During that interview, Plaintiff described the physical requirements of her

job, including sitting in a "perfect posture position" to evaluate slides under a microscope.  She

explained that she was developing scar tissue in her back where the hardware had been inserted,

and that as a result she suffered pain in her hip and "ha[d] to use a cane to ambulate as her leg

gives out on her." (UPCL01315).  She also reported that the drugs she was prescribed to manage

the pain made her "gaga." (UPCL01316).

On April 22, 2004, Unum notified Plaintiff that it had approved her for long-term

disability benefits.  Def. Mot. at 3 (UPCL 01304-06).  Unum noted that the policy's definition of

"disabled" would change after 12 months, at which time Plaintiff would have to provide proof

that she could not perform "any gainful occupation" instead of simply her "own occupation."

Def. Mot. at 3 (UPCL01344).

Approximately five months later, Unum notified Plaintiff on September 28, 2004 that her

claim was approaching the "any occupation" phase and that Unum would be investigating

accordingly.  Unum requested vocational and medical information from Plaintiff.  Def. Mot. at 3

(UPCL01253-55).  Plaintiff provided Unum a supplemental statement on November 15, 2004 in

which she described continuing pain and concomitant impairment of cognitive skills as a side-

effect of the medications she was taking.  Def. Mot. 3-4 (UPCL01224).  Dr. Barton also supplied

a supplemental statement dated on November 15, 2004, in which she described Plaintiff's

ongoing symptoms, including "burning feet," listed the drugs and dosages that Plaintiff was

"currently taking," and noted that she continued physical therapy and psychotherapy for pain and

stress management.  (UPCL01222).  Dr. Barton further noted, however, that she had not

performed any additional tests on Plaintiff, and she deferred any evaluation of her physical

therapy progress to her physical therapist Mr. Steiner.  *Id.*

On January 20, 2005, Mr. Steiner completed another EFA form for Unum.  Def. Mot. at 4

(UPCL00993-94).  Steiner reported that "[p]atient continues to be severely mechanically

dysfunctional." (UPCL00993).  He noted that she could not lift 10 pounds, push or pull any

weight, bend over, or kneel, and could only rarely climb stairs or reach above the shoulder. (UPCL0094).  She did have the capability to perform "fine manipulation" with both hands, although she failed the "power grip" evaluation and could not use her feet to operate a foot control.  *Id.*  Also, Plaintiff's "[p]rognosis [was] unchanged," and would improve at an "undetermined [time], but more than ½ - 1 [year] [or] more."  *Id.*

On January 13, 2005, Unum conducted a two hour in-home interview with Plaintiff.  Def. Mot. at 4 (UPCL01054-58).  She reported to the Defendant's representative that she would have continued discomfort in performing her duties of evaluating slides with a microscope, and that she could not sit for longer than two hours at a time.  Def. Mot. at 4 (UPCL01055-56).  She also stated that she attended water therapy treatment as part of her physical therapy two hours per day, five to six days per week.  Def. Mot. at 4 (UPCL01055).

On February 24, 2005, Unum conducted an occupational review in which Defendant's representative, Richard Hall, used information on file and the Dictionary of Occupational Titles to determine the physical requirements of Plaintiff's job.  Def. Mot. at 5 (UPCL01065).  He determined that her occupation as a cytotechnologist involved "lifting, carrying, pushing, pulling up to 10 pounds occasionally," generally involved "mostly sitting" as well as "standing and/or walking for brief periods."  *Id.*  He also determined that her job required "frequent abilities for reaching, handling, fingering, near acuity, and color vision to complete material."  *Id.*

On March 24, 2005, Unum had a functional capacity evaluation (FCE) performed by Kim Witherspoon of Advantage Rehabilitation and Hand Specialty Center.  (UPCL00949-53).  Ms. Witherspoon concluded that Plaintiff was capable of performing physical work at a sedentary level for an eight hour work day.  (UPCL00953).  She observed that Plaintiff exhibited some

"self-limiting" behavior, but participated fully in "14 out of 15 tasks and demonstrated self-limiting participation by stopping on 1 out of 15 tasks." *Id.* Ms. Witherspoon found that Plaintiff was not consistent in the effort she put forth for the hand strength assessment. (UPCL00952). Unum notes that it sent Dr. Barton two letters, dated April 8th and 16th, 2005, in which it requested Dr. Barton to advise "if she disagreed with the FCE results." Def. Mot. at 6. The letters requested "medical findings that support[ed] [her] reasons" for disagreeing with any results. (UPCL00931). Unum asserts that Dr. Barton never replied to these inquiries. Def. Mot. at 6.

On April 8, 2005, Unum had Richard Hall complete a vocational analysis. Def. Mot. at 6 (UPCL00925-29). Based on the Plaintiff's education, her vocational history as a cytotechnologist since 1979, and the FCE evaluations, Hall identified four possible occupations for Plaintiff: (1) laboratory supervisor, (2) laboratory manager, (3) health educator, and (4) assistant metallurgia. (UPCL00926). In Hall's opinion, these occupations "would exist (in significant numbers) in the claimant's geographical area of Metairie, Louisiana." (UPCL00925).

On April 19, 2005, "Unum's in-house physician," Dr. Brian Brock, reviewed Plaintiff's entire file. Def. Mot. at 7 (UPCL00920-21). He evaluated her regimen of medications including neurontin (anti epilepsy drug used off brand to treat neuropathy), Lexapro (anti depressant/anti anxiety), Robaxin (muscle relaxant), Vicodin (narcotic), and Ambien (sleeping aid). (UPCL00920). He found that she was "doing well with her medication regimen and there was no indication of concern for adverse medication effects or need to alter dosage or types of medications." *Id.* He reviewed the FCE and noted that at no time had any professional

expressed concern for the "adverse mediation side effects that would preclude sedentary work capacity." Def. Mot. at 8.

On April 20, 2005, Unum notified Plaintiff that she no longer qualified for disability benefits under the policy. Def. Mot. at 8 (UPCL00905-10). The letter acknowledged that Plaintiff had been awarded Social Security Disability benefits, effective March 2004. (UPCL00907). However, Unum stated that the FCE from March 2005 was not available when the Social Security Administration made its determination in 2004. *Id.* On June 5, 2005, Plaintiff requested an appeal and stated that she would provide additional information. (UPCL00875).

In subsequent correspondence, Plaintiff provided a letter from Leo A. Pei, M.D., a professor of clinical pathology and the Plaintiff's supervisor at the Louisiana State University Health Sciences Center. (UPCL00869-70). The letter expressed Dr. Pei's disagreement with the FCE because of the "lack of attention to the cognitive impairment related to her prescribed medications." (UPCL00870). Dr. Pei listed the Plaintiff's medications and concluded that, in his professional opinion, "it would be a liability to knowingly hire someone in her current physical/cognitive state for a position that directly affects patient safety." *Id.*

Mr. Steiner, Plaintiff's physical therapist, provided another letter dated June 5, 2005, in which he sought to "clarify" his prior report. (UPCL00868). He stated that his assessment of the Plaintiff's zero capacity to perform sedentary work is "directly related to her inability to tolerate prolonged (6-8 hours) sitting or standing." *Id.* He noted that she had "severe pain and bilateral peripheral neuropathy of the feet, legs, and hip," and that she "continues to experience debilitating episodes." *Id.*

On July 12, 2005, another Unum "in-house physician," Woolson Doane, M.D., reviewed Plaintiff's entire file.  (UPCL00833-35).  He noted that the FCE by the independent examiner conflicted with the opinion of Plaintiff's physician and physical therapist.  Dr. Doane also characterized Dr. Pei's letter as "dubious" because he was Plaintiff's supervisor, not her examining physician.  (UPCL00835).  He noted that neither of the "third party observers," field interviewer Charles McGinty or physical therapist Kim Witherspoon, had observed any indication of cognitive deficits from medication.  *Id*.  Dr. Doane concluded that any disability was still based on "self-reported limitations" and that the file lacked any evidence of cognitive impairment by way of "observation or ancillary testing."  Def. Mot. at 10 (UPCL00833).

On July 27, 2005, Unum again notified Plaintiff by letter that her appeal would be denied.  (UPCL00823-26).  By correspondence dated December 20, 2005, Plaintiff's counsel notified Unum that Plaintiff would be filing a second appeal.  (UPCL00810-11).  The letter also notified Unum that Plaintiff would be undergoing surgery as a remedy for her pain.  *Id.*

On January 16, 2006, Plaintiff underwent a surgical procedure to have an intrathecal pump implanted in her abdomen.  On January 26, 2006, Plaintiff's counsel sent a fax to Unum to inform it that the procedure had been completed.  An intrathecal pump is a device designed to inject pain reliever via catheter directly into the bone, thus allowing smaller doses to be utilized with the same effect.  (UPCL00875).  Plaintiff's intrathecal pump injected delaudid (also spelled "dilaudid"), a narcotic pain reliever.  Included in the January 26th fax was a list of Plaintiff's treating physicians.  (UPCL00790).  Plaintiff's counsel also included a handwritten note from January 3, 2005, from Dr. Barton stating that Plaintiff had been under her continuing care since August 2003 due to two failed spinal fusions and that "[h]er condition warrants ongoing

treatment and continues to render her disabled."  (UPCL00788).

On February 6, 2006, Unum received records from Dr. D.C. Mohnot, a neurologist who performed a consultation on Plaintiff in March and June of 2005 concerning headaches that the Plaintiff was experiencing.  (UPCL00705-08; 00737-45; 00753-65).  Dr. Mohnot's evaluation noted that some parts of Plaintiff's spine showed "minimal broad-based disc bulging deforming the ventral thecal sac" with little deformation of the ventral cord.  (UPCL00743).  However, Dr. Mohnot observed, "At the C6-7 level, there is disc herniation that is slightly asymmetric to the left and is deforming the cord and with ligamentum flavum hypertrophy is causing mild central canal stenosis."  *Id.*  He concluded that the evaluation showed "spondylosis" and that if she "has symptoms suspicious of a myelopathy or demylinating disease then short interval follow-up imaging with attention to the cord should be performed."  (UPCL00742).

Dr. Mohnot's report included an evaluation by Dr. Roger Smith for neurosurgical consultation dated December 13, 2005.  (UPCL00746-47).  Dr. Smith's evaluation included a listing of the medications Plaintiff was taking at the time (Percocet, Vicodin, Robaxin, Mobic, Neurontin, Lexapro, Lyrica along with Trileptal, Lamictal, and Relpax for headaches).  He performed a physical evaluation of Plaintiff, noting that she is "well-developed" and "alert and cooperative."  (UPCL00747).  However, she had slightly reduced vision in her right eye, she is "mildly tender" over the incision on her back, and her range of motion is "restricted in flexion and extension and both these maneuvers cause pain across the low back and into the sacrum."  (UPCL00746-47).  He observed that the MRI "shows there is probably a congenital spondylolisthesis at L4-5," and considering that "[s]he has tried most pain relieving modalities . . . an intrathecal infusion pump for opiate administration could be considered in this setting."

(UPCL00746).

On or about March 2, 2006, Unum received medical records from William Brasted, Ph.D., a clinical psychologist, which provided information on consultations with Plaintiff commencing on March 30, 2004, through February 2, 2006.  (UPCL00640-91).  Dr. Brasted performed consultations with Plaintiff twice monthly from March 30, 2004 to February 2, 2006, for the purposes of treatment and pain management and support.  Def. Mot. at 12.  Dr. Brasted's notes record a history of back pain with "pain ratings" generally at 7 or 8, along with dysphoria (depression/irritability) and anxiety.  *See* UPCL00685, 00668, 00658.

On or about March 30, 2006, Unum received medical records from Dr. Smith regarding the operation performed on the Plaintiff to implant the intrathecal pump.  (UPCL00427-40; 00463-577).  Unum sent a letter to Dr. Smith on April 11, 2006 requesting "any restrictions and/or limitations associated with the delaudid pump and the date such restrictions began."  Def. Mot. at 13.  The same day Unum sent a letter to Plaintiff's counsel with a copy of the letter to Dr. Smith, stating that a response from Dr. Smith was needed within 30 days or Unum would proceed with the appeal with the information on hand.  Def. Mot. at 13 (UPCL00414).  On April 26, 2006, Plaintiff's counsel informed Unum that Dr. Smith was the primary treating physician; however, by correspondence on May 5, 2006, Plaintiff's counsel advised Unum that Dr. Smith was overburdened at Oschner Foundation and could not draft a report.  Moreover, Plaintiff's counsel told Unum that Dr. Smith's only role in the treatment was to perform the surgery on Plaintiff, and he could not render any opinion other than the fact that the surgery was successful. Def. Mot. at 13 (UPCL00380; 00366).

On 15, 2006, Dr. Doane of Unum again reviewed Plaintiff's entire file.  Def. Mot. at 14

(UPCL00330-31).  Dr. Doane found that Dr. Smith's evaluation of the Plaintiff "did not record

any evidence of altered mental function but found mild palpable tenderness over the low back

area and decreased range of motion of the lumbar spine."  (UPCL00330).  In regards to the

implantation of the intrathecal pump, Dr. Doane "found no reference to compromised ADLs or

cognitive impairment."  *Id.*  Doane stated "[t]here is no objective independent test that measures

the presence or absence of pain.  Pain report is, therefore, a symptom."  *Id.*  However, Doane

stated that "[t]he available medical records adequately document this claimant's multifaceted

treatment for a self-reported chronic pain syndrome following extensive surgery for chronic low

back pain (so-called 'failed back syndrome')."  *Id.*  He noted, "Records indicate gradual

[escalation] of the intrathecal Dilaudid dose" and concluded, "Thus, we have a claimant

reporting chronic pain as a result of multiple back surgeries for a left L4-5 and S1

radiculopat[h]y for which she is clearly opiate habituated and dependent."  *Id.*

By letter dated June 27, 2006, Unum notified Plaintiff's counsel that her second appeal

would be denied.  (UPCL00316-18).  Unum informed Plaintiff that it would pay an additional 12

months of benefits, but that no further benefits would be paid to her because her claimed

disability was based on "self-reported symptoms," which is an exclusion to the Unum policy.  Pl.

Mot. at 3 (UPCL00318).  The letter stated that, while Dr. Mohnot's records "document his

trigger point injections for complaints of occipital and left sided headaches and muscle tension of

the cervical para spinal and posterior shoulder muscles . . . [h]is clinical examinations did not

document evidence of altered mental status or abnormal clinical neurological examinations."

(UPCL00317).  Dr. Mohnot's records also documented "multiple medication trials for control of

your client's complaints of chronic pain."  *Id.*  The letter also noted that "Dr. Brasted's notes

record his supportive psychotherapy sessions, but provide no new diagnostic information."  *Id.*
However, it stated that "[t]he only complete physical and neurological examination provided is
by Dr. Smith at his initial evaluation on December 13, 2005," and that "[f]ollowing his
evaluation he recommended intrathecal catheter with infusion pump . . . for pain control."  *Id.*

In a letter dated July 19, 2006, Plaintiff's counsel requested a third appeal.
(UPCL00281-308).  Included in the letter was case law from the Sixth Circuit and a copy of
internet literature on "Spinal Morphine Pump."  On August 16, 2006, Unum notified Plaintiff's
counsel that the third appellate review of her claim was complete and that the decision to deny
her claim would be upheld.  (UPCL00275-76).

## II.  ANALYSIS

The present matter has been submitted by the parties for determination on cross-motions
for summary judgment based upon the administrative record.  "Summary judgment is proper
when the evidence reflects no genuine issues of fact and the non-movant is entitled to judgment
as a matter of law."  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).
Where cross-motions for summary judgment are presented, "the motions are reviewed
independently, with evidence and inferences taken in the light most favorable to the nonmoving
party."  *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366 (5th Cir. 2005).
Regarding what evidence this Court may review in evaluating the plan administrator's decision,
"when assessing factual questions, the district court is constrained to the evidence before the
plan administrator."  *Vega*, 188 F.3d at 299 (citations omitted).  A court "may not stray from [the
administrative record] but for certain limited exceptions, such as the admission of evidence

related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim." *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 215 F.3d 516, 521 (5th Cir. 2000).

Unum issued Tenet Healthcare Corporation the Group Long-Term Disability Policy No. 546864 001.  (UPCL01318-60).  The policy provides, "When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility and to interpret the terms and provisions of the policy."  (UPCL01348).  The policy continues to state:

> In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan.  Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

(UPCL01324).  Considering the broad language of this clause within the Unum policy, it appears that the administrator has discretion to both interpret the plans terms and make factual determinations.  *High v. E-Systems Inc.*, 459 F.3d 573, 576 (5th Cir. 2006) ("When, as here, the language of the plan grants discretion to an administrator to interpret the plan and determine eligibility for benefits, a court will reverse an administrator's decision for abuse of discretion.") (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999)).  Regardless, in this case the Plaintiff challenges the plan administrator's determination of eligibility, and the Fifth Circuit uniformly finds such a determination to be a factual one that is reviewed under the abuse of discretion standard.  *Wade v. Hewlett Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 540 (5th Cir. 2007) (finding plaintiff's challenge that "his condition qualifies as a disability" is a factual determination and subject to abuse of discretion

13

standard); *Pierre v. Conn. Gen. Life Ins. Co./Life Ins. Co. of North America*, 932 F.2d 1552,

1562 (5th Cir. 1991) ("[F]or factual determinations, under ERISA plans, the abuse of discretion

standard of review is the appropriate standard.").  "To assess abuse of discretion, [this Court

must] 'focus on whether the record adequately supports the administrator's decision.'" *Wade*,

493 F.3d at 541 (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 298 (5th Cir. 1999)).

"In the summary judgment context, to avoid reversal, the ERISA administrator's decision must

be supported by substantial evidence in the administrative record." *High v. E-Systems Inc.*, 459

F.3d 573, 576 (5th Cir. 2006) (citing *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th

Cir. 2004).  Substantial evidence "is evidence that a reasonable mind might accept as sufficient

to support a conclusion." *Wade v. Hewlett Packard Dev. Co. LP Short Term Disability Plan*,

493 F.3d 533, 541 (5th Cir. 2007), *citing Ellis*, 394 F.3d at 273 (defining substantial evidence as

"more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."); *see Jenkins v. Cleco Power, LLC*, 487

F.3d 309, 314 (5th Cir. 2007) ("The administrator's decision will only be upset if it acted in an

arbitrary and capricious manner in denying benefits.").

  The status of Unum as both the insurer and the plan administrator presents the issue of

conflict of interest.  Under Fifth Circuit precedent, "[t]he mere fact that benefit claims are

decided by a paid human resources administrator who works for the defendant corporation does

not, without more, suffice to create an inherent conflict of interest." *MacLachlan v. ExxonMobil

Corp.*, 350 F.3d 472, 479 n.8 (5th Cir. 2003).  However, the Supreme Court in *Metropolitan Life

Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008), held that "the fact

that a plan administrator both evaluates claims for benefits and pays benefits claims" creates a

14

conflict of interest because "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." *Id.* (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987)).  As recognized by the Fifth Circuit, *Glenn* holds that the self-interested insurer's inherent conflict of interest must be weighed "as a 'factor in determining whether there is an abuse of discretion' in benefits denial, meaning [this Court must] 'take account of several different considerations of which conflict of interest is one.'" *Crowell v. Shell Oil Co.*, --- F.3d ----, 2008 WL 3485331, at *11 (5th Cir. 2008) (quoting *Glenn*, 128 S.Ct at 2328).  The Supreme Court laid down no precise standard for making this determination, finding it unnecessary "to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Glenn*, 128 S.Ct at 2351.

Defendant Unum determined that Plaintiff's disability did not qualify under the disability provision of Unum's policy because it was based on "self-reported symptoms," and further that Plaintiff could find other gainful employment.  The Unum policy states, "Disabilities, due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period up to 24 months," after which "Unum will not pay beyond the limited pay period."  (UPCL01335).  The policy defines "self-reported symptoms" as:

> [T]he manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine.  Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

(UPCL01320).  The policy further provides:

> After 12 months of payments, you are disabled when Unum determines that due
> to the same sickness or injury, you are unable to perform the duties of any gainful
> occupation for which you are reasonably fitted by education, training or
> experience.

(UPCL01344).  "Gainful occupation" is defined as "an occupation that is or can be expected to

provide you with an income at least equal to 60% of your indexed monthly earnings."

(UPCL01322).  As the plan administrator found that the Plaintiff was not disabled because her

disability was based on self-reported symptoms, and moreover that the Plaintiff could find and

perform gainful employment, accordingly this Court must determine (1) was the Plaintiff

disabled under the terms of the policy, *i.e.*, was her ailment based on self-reported symptoms,

and (2) whether this ailment prevented the Plaintiff from performing a "gainful occupation."


**A.  Was the Administrator's Determination that Plaintiff's Disability was Based Upon Self-Reported Symptoms an Abuse of Discretion?**

As to the first issue, the Court finds that the administrator's determination that Plaintiff

was not disabled because her claim was based upon "self-reported symptoms" is not supported

by substantial evidence within the record, and accordingly it must be reversed.

By the time that the Plaintiff made her final appeal, she had developed substantial

evidence within the record that her disability was supported by verifiable medical evidence.  Her

ailment was initiated by a bike accident in 1992, a fact that appears undisputed by Defendant.

Consequently, she had surgery performed to have four cages inserted into her lower spine in

1998.  One of these cages slipped and rested on a nerve, which required surgery to remove that

cage in 2000.  She consequently need to have a plate and pedicle screws inserted into her spine

in lieu of the spinal cages.  These procedures lead to a spinal leak, a verifiable symptom.  She

16

required treatment for that spinal leak, which included surgeries through 2003, although none of them apparently were successful in treating this ailment.

On September 23, 2003, an electromyography (EMG) was performed on Plaintiff and evaluated by Dr. Amy Gutierrez, an associate professor of neurology at Louisiana State University Medical Center. (UPCL00192-93). The EMG report, supplied to Defendant, notes in the "Findings" section that "EMG of the left leg showed chronic and partial denervation of the TA, MG, VL, and short head of Biceps." (UPCL00192). Dr. Gutierrez concluded that "[t]he electrodiagnostic findings are consistent with a chronic denervation in the left L4, L5, and S1 myotomes." *Id.*

On October 26, 2003, Dr. Barton completed an examination of Plaintiff and submitted her findings to Unum. (UPCL00196). In the form she sent to Unum, under the section entitled "Objective Findings," Dr. Barton confirmed that the electromyography (EMG) performed on Plaintiff showed "denervation in muscles supplied by L1, L5 [and] S1." *Id.* Moreover, the magnetic resonance imaging (MRI) procedure performed on Plaintiff showed "canal stenosis" and "foraminal stenosis." objectively verifiable conditions which Dr. Barton notes resulted in increased pain. *Id.*

For further diagnosis of Plaintiff's condition, a lumbar myelogram was performed on her by Dr. Michael Voth on November 13, 2003. (UPCL00186-87). His report concluded that "postoperative and degenerative changes are present," and "L4-L5 shows evidence suggesting narrowing of the right neural foramen secondary to bony degenerative change." (UPCL00186). Dr. Burger performed a review of the myelogram, finding, "It is clear from the myelogram that [Plaintiff] does not have central canal stenosis or foraminal stenosis, but the myelogram does

show signs of arachnoiditis with blunt-ending nerve roots." (UPCL00734).  Dr. Burger further

noted, "I do not think that I can alleviate any of her pain by caudal blocks or epidurals, as there

is dense scar tissue and the dural sac is adherent to the bone."  *Id.*  Dr. Burger suggested that

Plaintiff "would be a very good candidate for a dorsal cord stimulator to curtail her chronic

radiculopathy," but "[u]nfortunately, she has exhausted all of her surgical benefits, and no

further surgical intervention would be able to alleviate her pain."  *Id.*

Two years later, in March and June of 2005, Dr. D.C. Mohnot also performed an

examination of the Plaintiff.  (UPCL00705-08; 00737-45; 00753-65).  This examination found

"minimal broad-based disc bulging deforming the ventral thecal sac."  (UPCL00743).  He further

found, "At the C6-7 level, there is disc herniation that is slightly asymmetric to the left and is

deforming the cord" that resulted in "mild central canal stenosis."  *Id.*  He concluded his

evaluation with a diagnosis of spondylosis.  *Id.*  Dr. Roger Smith's evaluation of December 13,

2005 also found that Plaintiff was tender over the incision in her back with limited range of

motion.  (UPCL00746-47).  He noted that an MRI of Plaintiff's back "shows there is probably a

congenital spondylolisthesis at L4-5" and recommended that an intrathecal pump for direct

administration of pain medication.  (UPCL00746).  That surgery was performed in January 2006.

(UPCL00875).

Disabilities of the spine that cause a claimant significant pain have been the basis for

ERISA claims within this circuit.  In *Schexnayder v. CF Industries Long Term Disability Plan*,

553 F. Supp. 2d 658, 660 (M.D. La. 2008), the plaintiff sought disability benefits under his

employer's ERISA plan for a back injury that prevented him from returning to work.  The

employer's plan administrator denied benefits, finding that plaintiff's "complaints of pain to be

subjective and 'not consistent' with the objective findings." *Id.* at 666.  However, the district court found that the plaintiff's subjective complaints of pain to be corroborated by medical evidence, specifically an MRI that revealed that plaintiff suffered "laminectomary and significant stenosis in the lumbar spine." *Id.*  The court held that "[d]efendant abused its discretion in discounting the subjective evidence of [p]laintiff's pain and the objective evidence corroborating the disability," and moreover concluded that defendant's "reliance on the FCE and opinions of physicians who did not examine [p]laintiff is an abuse of its discretion."  *Id.* at 667.

Similarly, the Court finds that it was an abuse of discretion for the plan administrator to deny Plaintiff's disability benefits claim.  As described above, medical experts repeatedly examined Plaintiff, and each evaluation resulted in objective diagnoses of medical conditions that caused Plaintiff's chronic back pain.  The contrary medical evidence was minimal. Defendant asserts that Plaintiff's file was reviewed thoroughly by Plaintiff's in house physicians. The Court discounts these analyses because they are based solely on documentary review instead of personal examination, and each physician that personally examined the Plaintiff found objective evidence of her spinal ailments.  *See Cavaretta v. Entergy Corp.* (reversing administrator's denial of benefits where "no physician who has treated [plaintiff] has stated that he can perform sedentary work").  This Court is aware that administrators are under no obligation to provide medical evidence where none is provided by the claimant.  *See Vega*, 188 F.3d at 287 ("There is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant.").  However, here Plaintiff has supplied ample objective medical evidence supporting her subjective pain, contrary to the conclusions of

Defendant's physicians who only reviewed the records.  Not only was Plaintiff's condition confirmed through examination over several years, the examination reports also included prognoses, suggested limitations in activity, such as Dr. Barton's restrictions of "no lifting/no gripping - only occasional stair climb[ing]/reaching overhead" (UPCL00021), and recommended treatments, such as several reparative surgeries and insertion of an intrathecal pump.  *See Ned v. Hartford*, Civ. A. No. 06-0686, 2007 WL 594902, at *9 (W.D. La. Feb. 16, 2007) (denying ERISA claim because statement of diagnosis "alone is insufficient to support a finding of disability [because it] contains no prognosis, no findings or comments regarding [plaintiff's] ability or inability to engage in any work activities of her own or any other occupation, and no statement of any past or present disability.").  Defendant also relies on the FCE performed by its independent evaluator, but she is not a medical expert.  Moreover, even her evaluation noted that Plaintiff had a "Trendelenburg gait contributing to core weakness on left" and a "[l]eft lateral postural lean." (UPCL00951).  These further observations amount to additional objective evidence of Plaintiff's condition.

The Court further gives weight to two additional factors.  First, the Social Security Administration granted Plaintiff disability benefits March 1, 2004, finding that she could not perform any occupation.  Defendant noted this fact in its denial letter of April 20, 2005. (UPCL00907).  The Defendant discounted the Social Security Administration's grant of benefits because the FCE from March 2005 was not available to the federal agency in 2004.  *Id.*  This Court is aware that disability adjudications by the Social Security Administration are determined according to a different standard than ERISA determinations.  *See Hammond v. Unum Life Ins. Co. of America*, Civ. A. No. 3:05cv632HTW-LRA, 2008 WL 906522, at *11 (S.D. Miss. Mar.

31, 2008) ("Differences between the Social Security disability program and ERISA benefits plans caution against importing standards from the first into the second."). However, as has been noted here, the March 2005 FCE states that Plaintiff experienced pain in performing several of the examiner's tests, and she had objectively verifiable symptoms of spinal ailment, such as a Trendelenburg gait. (UPCL00951). Additionally, Unum cited no medical expert evidence. Consequently, the March 2005 FCE should not have been given such weight as the sole reason for Unum's discounting of the Social Security Administration's determination.

Moreover, the Court gives weight to Unum's conflict of interest. As described *supra*, the Supreme Court has held that there is an inherent conflict of interest where a company acts as both insurer and plan administrator because "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." *Glenn*, 128 S.Ct. at 2348 (quoting *Bruch*, 828 F.2d at 144). Here, the only medical experts that found that Plaintiff did not have any objectively verifiable symptoms were Unum's "in-house physicians." Additionally, when addressing Plaintiff's claims that her pain could be verified thorough the various medications she was prescribed, Unum vacillated between asserting that there was no proof that she actually was taking the medication and claiming that there was no evidence that her medication actually impeded her ability to work. This Court finds, therefore, that Unum's inherent conflict of interest deserves some weight in evaluating whether Unum abused its discretion in refusing Plaintiff disability benefits.

Accordingly, having evaluated the administrative record presented in this case, the Court holds that Unum's determination that Plaintiff's disability was based on self-reported symptoms was not based on substantial evidence. In stacking the evidence, Plaintiff has presented

21

objective medical evaluations that confirm her condition and pain that she is experiencing.  She

provided proof of medical tests, including an MRI, an EMG, and a lumbar myelogram, all of

which confirmed that Plaintiff suffered from objective disabilities.  She also provided proof of

surgeries that were designed to alleviate her condition, although they were not entirely

successful and resulted in further complications, including a spinal leak.  The Court finds that

Unum's conclusion that Plaintiff's disability was based solely on self-reported symptoms is not

supported by substantial evidence, considering the overwhelming evidence to the contrary

presented by Plaintiff.  Indeed, the administrator's conclusion appears to be based mainly on the

opinions of Unum's in-house physicians, opinions that were based solely on reviews of reports

and not on personal examinations.  Moreover, the Court gives weight to the fact that the Social

Security Administration granted Plaintiff disability benefits, and that Defendant's representatives

operated under an inherent conflict of interest as a self-interested insurer.  Because Unum's

conclusion was not based on substantial evidence, the plan administrator's decision was an abuse

of discretion and will be reversed.


**B.  Was the Administrator's Determination that Plaintiff Could Obtain Gainful**

**Employment an Abuse of Discretion?**

          This Court similarly finds that Unum abused its discretion in determination that Plaintiff

was qualified for gainful employment.  In its final denial of April 2005, Unum found that it had

based its decision on "medical and vocational information obtained, and the policy provisions."

(UPCL00909).  Unum noted that Plaintiff had been diagnosed with failed back surgery

syndrome due to surgeries in 1998 and 200, as well as a diagnosis of neuropathy after a CT

myelogram.  Unum found, however, that Plaintiff appeared "to be quite stable on your medication regimen which has been longstanding."  *Id.*  Moreover, Unum noted that Plaintiff participated in "aqua therapy for two hours a day" and that she does "other balance exercises." *Id.*  In referring to Mr. Steiner's reports of physical therapy from March to November 2004, Unum notes that Plaintiff's "progress is described as slow," but that she "consistently show[ed] improvement in meeting therapy goals."  (UPCL00908).  Accordingly to Unum, however, the therapist's notes "do not explain why the physical therapist, on January 20, 2005, estimated you to have zero sedentary capacity."  *Id.*  Unum also cited a January 13, 2005 field visit by a Unum representative, in which the representative reported that Plaintiff had begun limiting her medication and did not exhibit "any signs of drowsiness or observable cognitive difficult."  *Id.* The field representative also noted that Plaintiff had attended a week-long cruise with the assistance of a friend.  *Id.*

Unum also referred to the FCE performed by Kim Witherspoon from March 2005.  The administrator focused on Witherspoon's conclusion that Plaintiff could perform sedentary work as long as she avoided "floor to waist lifting and repetitive squatting tasks."  (UPCL00907).  The review by "our Vocational Consultant" based upon Witherspoon's evaluation concluded that Plaintiff could be employed gainfully in three sedentary occupations with that required similar educational backgrounds.  *Id.*  Unum's administrator found that these occupations could be located in the greater Metairie, Louisiana area, and could provide Plaintiff with at least 60% of her indexed monthly earnings.  *Id.*  Accordingly, Unum's administrator concluded that "[b]ecause you no longer meet the contractual definition of disability, we regret that we cannot continue paying benefits."  *Id.*

After a thorough review of the administrative record, the Court finds that Unum abused its discretion because its finding that Plaintiff could perform sedentary work is not supported by substantial evidence.  First, Unum failed to account for repeated personal examinations of Plaintiff by medical experts who concluded that her pain was significant.  Plaintiff originally suffered a back injury that required spinal cages to be surgically implanted; however, one cage slipped out of place and caused Plaintiff significant discomfort.  Dr. Barton, Plaintiff's treating neurologist, advised Plaintiff to stop working due to failed back surgery syndrome, low back pain, and lumbar radiculopathy in November 2003.  She received additional surgeries and treatment to alleviate her pain through 2003 and 2004.  On November 15, 2004, Dr. Barton provided another statement of ongoing treatment due to failed spinal fusions in which she described Plaintiff's current symptoms, including "burning feet," and listed all the drugs that she was taking at that time Neurontin, Ambien, Lexapro, and Robaxin.  (UPCL01222).  Dr. Barton confirmed her ongoing care of Plaintiff in January 2005 and observed that "[h]er condition warrants ongoing treatment and continues to render her disabled."  (UPCL00788).  Likewise, Dr. Roger Smith's evaluation of Plaintiff in December 2005 found that Plaintiff had reduced vision in her right eye, she was "mildly tender" over the incision in her back, and her range of motion was "restricted in flexion and extension and both these maneuvers cause pain across the low back and into the sacrum."  (UPCL00746-47).  Dr. D.C. Mohnot, another treating neurologist for Plaintiff's headaches, further documented spondylosis and recommended further treatment. (UPCL00742).  In January 2006, Dr. Smith eventually performed the surgical insertion of an intrathecal pump for pain management.

Second, Unum's conclusion that Plaintiff was making progress in physical therapy is

undercut by the reports of physical therapist Bruno Steiner.  Mr. Steiner saw Plaintiff on

numerous treatment sessions beginning in March 2004 through June 2005.  In these evaluations,

Steiner records that Plaintiff was "severely deconditioned" in March 2004 (UPCL00021), and

that in June 2005 she still experienced "severe pain and bilateral peripheral neuropathy of the

feet, legs, and hip," (UPCL00868).  Unum's evaluation discounts these reports as "check off lists

and diagrams," however, they specifically record Plaintiff's capability at numerous tasks,

including bending, kneeling, crawling, climbing stairs, and reaching above the shoulders, and it

notes with what frequency she can accomplish these tasks.  (UPCL00019).  Moreover, Steiner's

report includes particular evaluations of Plaintiff's hand dexterity.  *Id.*  Through Steiner's

treatment, he notably found that Plaintiff indeed could perform "fine manipulation" with her

hands.[1]  *Id.*  Steiner concluded that Plaintiff had zero sedentary capacity, specifically because of

"her inability to tolerate prolonged (6-8 hours) sitting or standing."  (UPCL00868).

     The Court finds it very notable that the inability of Plaintiff to engage in prolonged

sitting or standing was confirmed by other evidence in the administrative record.  Unum hired an

independent vocational expert, Kim Witherspoon, to evaluate Plaintiff.  She observed in her

report that Plaintiff could sit for approximately thirty minutes, but that "[p]ostural adjustments

were noted near the end of the 30 minutes and client requested to stand due to increased stiffness

and pain in the left buttock."  (UPCL00950).  Witherspoon also observed Plaintiff "weight

shifting frequently, primarily to the right side when standing for an extended period of time (20

---

[1]This Court finds Steiner's determination that Plaintiff has "fine manipulation"
essentially nullifies any self-limitation by Plaintiff in that examination during Kim
Witherspoon's evaluation.  (*See* UPCL00952).  Witherspoon found Plaintiff's overall
participation to be acceptable.  (UPCL00953).

minutes)." *Id.* She further noted hip problems in finding that Plaintiff "walks with a Trendelenburg gait." *Id.*

Plaintiff's limited capabilities are further corroborated by Unum's own representative who performed a visit at home visit on January 13, 2005. (UPCL01054-58). Plaintiff indicated at that time that she was "extremely limited after the surgeries" and was "unable to sit for more than two hours at a time." (UPCL01055-56). Unum's representative noted that her job "required some standing as the slides needed to be prepared sometimes as long as 1-2 hours at a time," and that "it did require a great deal of siting at a microscope all day long viewing slides." (UPCL01056). Unum's representative observed that Plaintiff "occasionally uses a cane to walk which is a stability issue with her," and that she "had to get up frequently as well to use the bathroom." (UPCL01057). Unum's report suggests that Plaintiff has more mobility in noting that she took a cruise, although little weight should be ascribed to a relatively inactive type of vacation that Plaintiff took "with the help of a friend." (UPCL00908).

The Court also credits a letter from Plaintiff's employer, Leo A. Pei, M.D., on June 17, 2005. (UPCL00869-70). Dr. Pei, a professor of clinical pathology, had reviewed the opinion of Unum's vocational rehabilitation expert. He described his concern with this opinion because it only focused on the "physical aspects of the job," as opposed to the "cognitive impairment related to her prescribed medications." (UPCL00870). Dr. Pei provided a thorough list of the Plaintiff's medications, and he opined that "[t]he intensive medication regimen, necessary to manage her chronic pain and spinal headaches post-myelogram, are considerable and have a definite impact on her ability to perform the required independent decision-making and judgment functions." *Id.* Dr. Doane, Unum's reviewing physician, noted Dr. Pei's letter as "dubious"

because he was Plaintiff's supervisor, and not her examining physician.  (UPCL00835).  While

the Court does recognize Dr. Pei's personal working relationship with Plaintiff, the Court also

notes that Dr. Pei is healthcare professional who knows the effects of narcotic mediation, and as

a laboratory professional he is best-positioned to know the rigors of a job like the Plaintiff's.

The Court particularly gives weight to Dr. Pei's opinion insofar as he explained that a person

with Plaintiff's medication regimen would not be a desirable candidate to be employed in a

laboratory setting as a cytotechnologist because the job requires a person to "perform

independently and form diagnostic opinions on which medical and therapeutic decisions are

based."  (UPCL00870).  Dr. Pei therefore credibly concluded that "it would be a liability to

knowingly hire someone in her current physical/cognitive state for a position that directly affects

patient safety."  *Id.*

   In evaluating this evidence, the Court finds that Unum's conclusion that Plaintiff could

perform a sedentary job was an abuse of discretion.  As defined by Unum's own vocational

expert, Richard Hall, the jobs that he found appropriate for the Plaintiff required 6-8 hours of

sedentary work capacity and the ability to meet precise standards, judgment, spatial perception,

and the ability to evaluate and quantify.  (UPCL00926-27).  The Court finds that the evidence

presented here in the record shows that Plaintiff cannot fulfill these criteria.  Numerous doctors

have confirmed that Plaintiff has been prescribed a wide array of narcotic drugs for pain relief.

As observed by Dr. Pei, an employer in his position would be taking on a "liability" in hiring a

person who is on significant narcotic pain relievers for a job like cytotechnologist.  Moreover,

even if these narcotic drugs did not impact her judgment, Mr. Steiner, Ms. Witherspoon, and

Unum's own field agent confirmed that Plaintiff has difficulty with prolonged sitting or standing,

limitations that can be liabilities where one's job duties include meticulous preparation of microscopic slides.  Again, the vast weight of evidence is contrary to the conclusion of Unum's administrator.  Accordingly, this Court holds that Unum's finding that Plaintiff could perform a gainful occupation is not supported by substantial evidence, and therefore it was an abuse of discretion.


## C.  Attorneys' Fees

"ERISA provides that '[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.'"  *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan*, 493 F.3d 533, 541-42 (5th Cir. 2007) (quoting 29 U.S.C. § 1132(g)(1)).  The Fifth Circuit has explained that:

> The following five factors [are] enumerated for consideration in ERISA cases when shifting attorney's fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position.

*Id.* at 542 n.6, *quoting Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir. 1980).  In evaluating the proceedings before it, this Court finds that an award of fees would be inappropriate.  While this Court is overturning the administrator's denial, the administrator did provide an explanation of Unum's reasons for denial.  *See Servat v. American Heritage Life Ins. Co.*, Civ. A. No. 04-2928, 2007 WL 2480342, at *21 (E.D. La. Aug. 28, 2007) (Engelhardt, J.) (awarding attorneys' fees where defendant "failed to adequately explain its reasons for its denial

[and] failed to fairly explain the type of information required to prove a claim under its policy").

No persuasive evidence of bad faith by either party has been presented here, and there appears

no need for any deterrence of culpable conduct.  This Court therefore will not award attorneys'

fees.

## III.  CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Rec. Doc. 15) is

**GRANTED**, and Defendant's Motion for Summary Judgment (Rec. Doc. 21) is **DENIED**, and

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Attorneys' Fees is **DENIED.**

New Orleans, Louisiana, this __30th__ day of September, 2008.

_____
      **STANWOOD R. DUVAL, JR.**
   **UNITED STATES DISTRICT JUDGE**